# CASES

## ARGUED AND DETERMINED

IN THE

# UNITED STATES CIRCUIT COURTS OF APPEALS AND THE DISTRICT COURTS

---

### MYRICK v. UNITED STATES (two cases).

### CUNNINGHAM v. SAME (two cases).

(Circuit Court of Appeals, First Circuit. January 6, 1915.)

Nos. 1034–1037.

1. POST OFFICE ☞15—SECOND-CLASS MATTER—"LEGITIMATE LIST OF SUB-SCRIBERS."

The phrase "legitimate list of subscribers," used in Act Cong. March 3, 1879, c. 180, § 14, subd. 4, 20 Stat. 359 (Comp. St. 1913, § 7306), providing that a publication, in order to be entitled to second-class rates, must be originated and published for the dissemination of information of a public character and have a legitimate list of subscribers, means a list of subscribers taken at more than a nominal price, and that the price must have been paid by the subscriber, or some one in his behalf, or be under obligation to pay the price, and that subscriptions taken at a nominal price or without price do not answer the requirements of the statute in that particular and cannot be counted in making up a legitimate list.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. § 22; Dec. Dig. ☞15.]

2. POST OFFICE ☞15—SECOND-CLASS MATTER—PAID SUBSCRIPTIONS.

On an application to admit a publication to second-class postal rates, evidence that a substantial number of subscriptions are overdue, or that the price paid or agreed to be paid for them is nominal, or that they are paid for by others than the recipients of the publication, or were obtained by the payment of large commissions or in connection with an offer of a premium, or other consideration, is material in determining whether the publication is primarily designed for advertising purposes for free circulation or for circulation at nominal rates, so that the entire publication should be excluded from second-class privilege at a cent a pound.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. § 22; Dec. Dig. ☞15.]

3. POST OFFICE ☞4—REGULATIONS—AUTHORITY OF POSTMASTER GENERAL.

The postmaster general has authority to make postal regulations not inconsistent with the Postal Act, under Rev. St. § 161 (Comp. St. 1913, § 235), providing that the head of each department may prescribe regulations, not inconsistent with law, for the government of his department, conduct of its officers and clerks, the distribution and performance of its business, and the custody, use, and preservation of the records, papers, and property appertaining to it.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. § 3; Dec. Dig. ☞4.]

---

4. CONSPIRACY ⊚⊸47—DEFRAUDING GOVERNMENT—SECOND-CLASS RATES—AP-PLICATION—FALSE PROOF.

In a prosecution for conspiracy to submit false evidence to the Post Office Department in support of an application to admit a publication to second-class rates, evidence *held* insufficient to warrant a finding that proofs submitted by defendants as to their subscription list were knowingly false in that facts were omitted which they were informed by the Post Office Department were immaterial.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. §§ 105–107; Dec. Dig. ⊚⊸47.]

5. CRIMINAL LAW ⊚⊸728—WITNESSES ⊚⊸305—PRIVILEGE OF ACCUSED.

Under the federal rule that cross-examination of a witness is limited to the matters concerning which he has been examined in chief, where accused, being tried on two indictments, testified in his own behalf as to a single fact only with reference to one of the charges, it was error to hold that he thereby waived his constitutional right *not to testify* as to any and all the matters charged against him and for the district attorney in argument to refer to his failure to testify fully and to draw unfavorable inference therefrom.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1689–1691; Dec. Dig. ⊚⊸728; Witnesses, Cent. Dig. §§ 1053–1057; Dec. Dig. ⊚⊸305.]

6. CRIMINAL LAW ⊚⊸402—EVIDENCE—BEST AND SECONDARY EVIDENCE.

A copy of a letter on which the addressee and the writer were designated by initials only, discovered in the Chicago office of a corporation of which defendants were officers, but not found in the possession of either of them, and for the admission of which no legal foundation was laid, was inadmissible.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 887, 888; Dec. Dig. ⊚⊸402.]

Putnam, Circuit Judge, dissenting.

In Error to the District Court of the United States for the District of Massachusetts; Jas. M. Morton, Judge.

Herbert Myrick and James M. Cunningham were convicted of conspiring to commit a misdemeanor, and they bring error. Reversed and remanded.

Edward F. McClennen, of Boston, Mass. (Albert W. Rice and Brandeis, Dunbar & Nutter, all of Boston, Mass., on the brief), for plaintiffs in error.

Asa P. French, U. S. Atty., and James S. Allen, Jr., Asst. U. S. Atty., both of Boston, Mass.

Before PUTNAM, DODGE, and BINGHAM, Circuit Judges.

BINGHAM, Circuit Judge. The plaintiffs in error, hereinafter called the defendants, were jointly indicted in the District Court of the United States for the District of Massachusetts on indictments No. 110 and No. 111, in each of which they were charged with conspiring to commit the misdemeanor denounced by section 223 of the Criminal Code of the United States (Act March 4, 1909, c. 321, 35 Stat. 1133 [Comp. St. 1913, § 10393]), which provides as follows:

"Sec. 223. Whoever shall knowingly submit or cause to be submitted, to any postmaster, or to the Post Office Department, or any office of the postal service, any false evidence relative to any publication for the purpose of

⊚⊸For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

securing the admission thereof at the second-class rate, for transportation in the mails, shall be fined not more than five hundred dollars."

The defendant Myrick was president and the defendant Cunningham was subscription manager of the Orange Judd Company, of Springfield, Mass., a corporation publishing the Orange Judd Northwest Farmstead, which, prior to January 1, 1911, was a semimonthly and after that date a weekly. This publication was purchased by the Orange Judd Company, about October 5, 1910; it having been published prior to that time at Brookings, S. D., under the name of Minnesota and Dakota Farmer.

November 30, 1910, the defendant Cunningham filed an application with the postmaster at Springfield to have the publication admitted to the mails at the publishers' second-class postage rate. This application is the subject-matter of indictment No. 110. January 19, 1911, he made another application to the postmaster at Springfield to have the same publication, which in the meantime had become a weekly, admitted at the publishers' second-class rate. This application is the subject-matter of indictment No. 111.

As to each of these applications the indictments respectively charge that the defendants conspired to the end that the defendant Cunningham should knowingly and fraudulently submit to the postmaster at Springfield, and to the Post Office Department of the United States, certain false evidence relative to such publication for the purpose of securing its admission to the Springfield post office at the second-class rate of postage. The specific false evidence alleged in the respective indictments is included in certain answers made to interrogatories on a printed form of application (No. 3501, Edition of 1910), issued by the Post Office Department. In each indictment the overt act alleged is the submission by the defendant Cunningham to the postmaster at Springfield of an application upon the blank referred to, which contained, among other things, the alleged false evidence.

The jury found the defendants guilty on both indictments, and sentences were imposed fining each of them $500 on each indictment.

The cases are now here on the defendants' bill of exceptions, and the errors assigned are to the refusal of the court to grant certain requests for instructions, to the admission of certain evidence, to the argument of the District Attorney and the ruling of the court thereon, and to certain instructions given to the jury.

It is contended in behalf of the defendants that the answers made to the questions submitted in the applications were immaterial, and therefore not false evidence, within the meaning of section 223 of the Criminal Code. Whether or not they are material can be determined only by an examination of the statute of March 3, 1879 (20 Stat. 358), as amended by the Act of March 3, 1885, c. 342, 23 Stat. 387 (Comp. St. 1913, § 7358), relating to mail matter of the second class. The Act of March 3, 1879, c. 180, 20 Stat. 358 (Comp. St. 1913, § 7302), provides:

"Sec. 7. That mailable matter shall be divided into four classes:
"First, written matter;
"Second, periodical publications;

"Third, miscellaneous printed matter;

"Fourth, merchandise."

"Sec. 10. (sec. 7304). That mailable matter of the second class shall embrace all newspapers and other periodical publications which are issued at stated intervals, and as frequently as four times a year and are within the conditions named in sections 12 and 14.

"Sec. 11. Publications of the second class except as provided in section 25, when sent by the published thereof, and from the office of publication, including sample copies, or when sent from a news agency to actual subscribers thereto, or to other news agents, shall be entitled to transmission through the mails at one cent a pound, or fraction thereof, such postage to be prepaid, as now provided by law. Act of March 3, 1885 (Comp. St. 1913, § 7358).

"Sec. 12. (sec. 7305). That matter of the second class may be examined at the office of mailing, and if found to contain matter which is subject to a higher rate of postage, such matter shall be charged with postage at the rate to which the inclosed matter is subject: Provided, that nothing herein contained shall be so construed as to prohibit the insertion in periodicals of advertisements attached permanently to the same."

"Sec. 14. That the conditions upon which a publication shall be admitted to the second class are as follows:

"First. It must regularly be issued at stated intervals, as frequently as four times a year, and bear a date of issue, and be numbered consecutively.

"Second. It must be issued from a known office of publication.

"Third. It must be formed of printed paper sheets, without board, cloth, leather, or other substantial binding, such as distinguish printed books for preservation from periodical publications.

"Fourth. It must be originated and published for the dissemination of information of a public character, or devoted to literature, the sciences, arts, or some special industry, and having a legitimate list of subscribers; provided, however, That nothing herein contained shall be so construed as to admit to the second-class rate regular publications designed primarily for advertising purposes, or for free circulation, or for circulation at nominal rates."

It thus appears that among the conditions with which a publication must comply in order to entitle it to admission to the second-class privilege at the publishers' rate is that it must be originated and published for the dissemination of information of a public character, or devoted to literature, the sciences, arts, or some special industry, and have a legitimate list of subscribers, and that the subscription price must be more than nominal; that, if the publication is designed primarily for advertising purposes, for free circulation, or for circulation at nominal rates, it cannot be admitted at the publishers' rate.

[1] The phrase "a legitimate list of subscribers" evidently means a list of subscriptions taken at more than a nominal price, and the price must have been paid, or the subscriber, or some one in his behalf, be under obligation to pay the agreed price; and that subscriptions taken at a nominal price, or without price, do not answer the requirements of the statute in this particular and cannot be counted in making up a legitimate list.

[2] While the fact that some subscription contracts may be overdue would not render such subscriptions illegitimate, nevertheless, if it appears as to a substantial number of subscriptions that they are overdue, or that the price paid or agreed to be paid for them is nominal, or that they were paid for by others than the recipients of the publication, or that they were obtained by the payment of large commissions, or in connection with an offer of a premium, prize, or other

consideration, such facts would be material evidence for the Post Office Department to consider in determining whether the publication was primarily designed for advertising purposes, for free circulation, or for circulation at nominal rates, so that the entire publication should be excluded from the second-class privilege of one cent a pound.

[3] The Postmaster General has authority to make regulations not inconsistent with the provisions of the act (Rev. St. § 161 [Comp. St. 1913, § 235]). His department has passed regulations that subscriptions to semimonthlies shall not be counted in the legitimate list of subscribers if they are three months in arrears, and that subscriptions to weeklies shall not be counted if they are one year in arrears, but that they may be mailed at the transient rate of one cent for each four ounces, or fraction thereof, prepaid by stamps affixed. It is argued that these regulations are inconsistent with and curtail the rights given by Congress in the statute above set forth, and our attention has been called to cases in which it has been held that the heads of the executive department of the government, even if expressly authorized to make regulations, cannot make any which curtail rights thus given. United States v. Atlanta Journal Co., 210 Fed. 275, 127 C. C. A. 123; United States v. Symonds, 120 U. S. 46, 49, 7 Sup. Ct. 411, 30 L. Ed. 557; Williamson v. United States, 207 U. S. 425, 461, 462, 28 Sup. Ct. 163, 52 L. Ed. 278; United States v. United Verde Copper Co., 196 U. S. 207, 215, 25 Sup. Ct. 222, 49 L. Ed. 449; Morrill v. Jones, 106 U. S. 466, 467, 1 Sup. Ct. 423, 27 L. Ed. 267.

If the regulations of the Post Office Department above referred to may be said to abridge the rights of publishers under the statute in the entry of mail matter at the second-class rate, and therefore to be unauthorized and void, it is unnecessary for us in this case to pass upon the question, as their validity or invalidity is not here in issue. This is not a proceeding by the government, as in United States v. Atlanta Journal Co., supra, where it was seeking to recover postage at a rate in excess of what had actually been paid, and directly involving the validity of the regulations of the Post Office Department, nor is it a proceeding to restrain the department from enforcing its regulations, but is a proceeding for an alleged conspiracy to violate a statute making it penal for a person to submit, or cause to be submitted, to a postmaster, or to the Post Office Department, any false evidence relative to a publication for the purpose of securing its admission at the publishers' rate. The regulations, therefore, become important, not as regulations of what constitutes a legitimate list of subscribers, but as bearing upon the defendants' knowledge of what information they understood the department required them to give in answering the questions submitted to them as the foundation of their application for the admission of their publication at the second-class rate.

In the first indictment (No. 110) the false evidence of which the government complains as having been submitted to the Post Office Department by the defendants related to two distinct matters. The first consisted of certain alleged false statements made in answers to interrogatories contained in the printed form of application above

referred to, to wit, in answers to interrogatories No. 12 (a), (b), (c), (d), (e), (f), and (g), that the total number of subscribers to the publication on the 25th day of November, 1910, was 41,273, whereas in truth and in fact, according to the allegations of the indictment, as the defendants well knew, the total number of said subscribers was only 26,610; and the second was that the answer to interrogatory 12 (d) was also false in that it was there stated that the commissions paid to agents were 33⅓ per cent., whereas they greatly exceeded that sum.

It appears, on an examination of the application, that question 12 embraces 12 subsidiary and distinct questions, of which (a), (b), (c), (d), (e), (f), and (g) comprise a part, and at the close of these 12 questions is a statement reading, "Total subscriptions set forth above, answer 41,273." The answers to the previous questions disclose that this is a correct total. It is difficult to see wherein this answer could be found to be false. But the Post Office Department, in questions 12 (a) to (m), was evidently undertaking to ascertain how many of the 60,000 printed copies of the issue of November 25th, stated in the answer to question 11, fulfilled the requirements of the questions (a) to (m); and it would seem that the first alleged false statement charged in the indictment must be included in the answers to these questions, rather than in the one calling for the "total subscriptions set forth above."

If this is the interpretation which should be placed upon this allegation of the indictment, it appears from the application that questions (a) to (g) do not state that, in answering the questions, subscriptions that were three months in arrears should not be included, or, if included, the applicant should further state, in answer to each question, the number of the subscriptions included in the answer that were three months in arrears.

The department having stated in these questions the specific matters which it desired the applicant to answer, it would seem that the applicant, in the absence of special instructions calling for additional information, would have the right to understand that the questions, as outlined by the department in the application, called for all the information desired, and that, if the answers to the questions as stated were complete and truthful, the applicant could not be said to have submitted false evidence. The government, however, contends that the department, by one of its regulations, had provided that subscriptions to semimonthlies that were three months in arrears should not be counted in the legitimate list of subscriptions, and that, in answering these questions, the applicants should have understood that their answers were to be made with reference to this regulation. If this is the view that should be taken of the matter, the question is presented whether the evidence discloses that the applicants knew of the regulation of the Post Office Department excluding subscriptions three months in arrears, and understood that, in framing their answers, each of the questions were to be regarded as modified to conform to the regulation.

The evidence introduced by the government, tending to show knowledge on the part of the defendants Myrick and Cunningham, at and before the filing of the application of November 30, 1910, that the regulations of the department provided that subscriptions to semi-monthlies three months in arrears should not be counted in making up the legitimate list of subscribers, and that their answers to questions (a) to (g) should be modified by excluding such subscriptions therefrom, is, to say the least, very meager and unsatisfactory. It is unnecessary, however, for us to pursue this line of inquiry, for if the evidence was insufficient to warrant the jury in finding that the defendants knew of the regulation, and that the questions were to be taken as modified accordingly, the evidence offered by the government on the question of commissions paid to agents was sufficient to warrant the jury in finding that the defendants, in answering question 12 (d), falsely stated that the commissions were 33⅓ per cent., when they knew that they were much more. There was evidence tending to show that some of the subscriptions included in defendants' answer to question 12 (d) were taken over from the Minnesota and Dakota Farmer, and that the defendants did not know whether their answer—that the commissions paid to agents for these subscriptions were 33⅓ per cent.—was true or false, and that they made no investigation to ascertain whether it was or not. There was also evidence from which it could have been found that subscriptions were included in the answer which had been procured since the purchase of the Minnesota and Dakota Farmer, and before November 25, 1910, and that the defendants also knew that the commissions paid for these subscriptions greatly exceeded 33⅓ per cent.

[4]. As the charge contained in this indictment is conspiracy to submit false evidence to the Post Office Department, and as we are of the opinion that the evidence, taken as a whole, would justify the conclusion that the defendants conspired to procure the admission of their periodical to the second-class privilege by statements that were false, and that their answer to question 12 (d) was knowingly false, the court did not err in submitting the case to the jury upon this indictment.

On January 1, 1911, the defendants concluded to change their publication from a semimonthly to a weekly, which necessitated their making a new application for its admission to the second-class privilege, and on January 19, 1911, they submitted a new application for this purpose. Indictment No. 111 relates to this application, and charges the defendants with having conspired to submit false evidence for the purpose of securing the admission of their publication at the second-class rate, and that the false evidence submitted consisted of a false statement made in their answer to 12 (g) contained in this application, to the effect that the claimed list of subscribers to said publication, whose subscriptions were paid for by others, was 6, when in truth and in fact, as the indictment alleges, the defendants well knew said statement was false in that 6,468 copies of said issue were sent to persons whose subscriptions were paid for by others.

The government's evidence tended to show that the defendants, in answering question 12 (g) in their previous application of November

30, 1910, stated that the number of the issue of November 25th, sent to persons whose subscriptions were paid for by others, was 10,496; that, through repeated interviews and correspondence between the officials of the department and the defendants, the defendants were told that subscriptions paid for by others, where the recipients had not agreed to receive the publication, should not be included in the answer to this question; that on January 13, 1911, the department decided to grant the first application and admit the publication to the mails at the publishers' rate, · but, in doing so, excluded the 10,496 subscriptions stated in the answer to question 12 (g), assents from the recipients not having been obtained. It is thus seen that before the filing of their second application, and as late as six days prior thereto, the defendants had received special instructions and information to the effect that in answering question 12 (g), calling for the number of subscriptions paid for by others, they should not include copies where the consent of the recipient had not been obtained. The government offered no substantial evidence warranting a contrary conclusion, and it would be inconceivable how the jury, as reasonable men, could have reached the conclusion that the defendants' answer to this question was knowingly false if it were not for the inferences which the District Attorney was permitted to tell the jury they could draw from the failure of the defendant Cunningham to testify to matters charged in the second indictment, a question hereinafter considered. We are therefore of the opinion that there was no evidence from which it could be found that the answer to question 12 (g) in the second application was knowingly false, and that the court erred in submitting the questions raised by the second indictment to the jury.

[5] Indictments 110 and 111 were tried together (U. S. Rev. Stat. §§ 921, 1024 [1]); and the defendant Cunningham took the stand and testified in his own behalf, confining his testimony to the source from which he obtained the information contained in the answer to question 12 (d) in the first application—that the commissions paid to agents were 33⅓ per cent. The District Attorney, in his closing argument to the jury, said:

"There is one thing that happened in this case, gentlemen, which I submit to you, is, on the part of one of the defendants, a confession as to certain of the allegations in these indictments. Mr. Cunningham was not bound to take the stand in his own behalf. The government could not have called him to the stand and examined him. But he chose to make himself a witness in this·case. He had the opportunity offered to him by law, gentlemen, to tell you all the facts within his knowledge, and to deny every allegation which he knew or believed was not true. That was his privilege when he took the stand. He took the stand, charged with three specific wrongful acts. He took the stand, charged with having collaborated with Mr. Myrick, co-operated with him, to make to the Post Office Department three false statements, bearing upon a matter of vital interest to the paper whose interests he and Mr. Myrick represented, and the paper in whose interest their personal interests are very largely concerned. He knew—he· is one of the two men in this world, gentlemen, who knows of his own knowledge—whether he conspired, whether he got together with Mr. Myrick or not to violate one of the laws of the United States. Isn't that so? He knows whether there was any understanding, expressed or implied, between them. He knew it when he took the stand. He knew whether, when he wrote that 41,200 and odd as the list of legitimate subscribers—he knew, above all other men in the world, whether

[1] Comp. St. 1913, §§ 1547, 1690.

that statement was true or false, and whether he knew it was true or false. He knew, as no other man in the world does know, and could tell you, whether, when he wrote the figure '6' in reply to that question as to the number of subscriptions to the paper that were paid for by others, that was true or not, or whether he believed it to be true or not. And yet he was asked as to only one of those things, the least important of them all, and that was as to how he happened to write that untrue statement regarding the commissions paid for subscriptions on the first application. In other words, Cunningham knew the information which you want, and wanted, as to whether or not the statement with regard to the 41,000 was true or false; he knew whether that was written in there in accordance with Mr. Myrick's instructions a few days before, when the telegram was received; he knew whether he knew it to be false or not; he knew that he was charged with it; and yet he was not asked to tell you, and he did not tell you, that that was true; and he was not asked to tell you that he didn't know that it was not true when he wrote it. And so, too, with the statement in the second application—absolute silence—charged with a violation of the law, taking the stand in his own cause to give you information—not asked whether, when he said '6,' that was true or false, or whether he knew it to be true or false, or whether it was put there because he and Mr. Myrick had put their heads together for the purpose of getting this newspaper admitted to second-class rates, and because they knew that the postal authorities had objected to that kind of subscription, but, as it appears, he deliberately wrote down something which they knew was not true. Why, gentlemen, take it in ordinary everyday life, suppose you accuse an employé of yours of an act of dishonesty, of a theft, or of a breach of duty of some kind not amounting to a crime, and you say, 'You did so and so,' or, 'I *think* you did so and so,' and he stands before you absolutely silent, not admitting or denying the fact, do you have any hesitation in believing that it is because he *can't* deny it? Is there any other reasonable explanation of his silence except that? Would you be justified in assuming that he was guilty of the charge that you made against him because of that silence alone? How much more so, then, in this case, where the knowledge of the truth or the falsity must have been in Cunningham's possession, as to all three of those allegations, and he is confined in his examination, and I am confined in my examination by reason of that fact, to denial of only one of them—as I said, the least important of them all!"

At the close of this argument, and before the court had entered upon its charge to the jury, and while there was opportunity on the part of the District Attorney to withdraw the comments which he had made with respect to the failure of the defendant·Cunningham to testify to certain matters with which he stood charged in the two indictments, counsel for the defendants objected to these comments, and requested the court to deal with them in the course of his charge. The court forthwith, and before delivering his charge, ruled "that a defendant in a criminal case could not waive his constitutional protection piecemeal, and that the defendant Cunningham having taken the stand, and testified as to certain facts in one of the indictments, his failure to testify as to independent facts in that indictment, and as to facts in the other indictment, was the subject of legitimate comment to the jury in argument," and declined to deal with the matter further, except as hereinafter set forth, and the defendants excepted.

In the course of his charge, the court, as to this matter, said:

"As to the defendant Cunningham, a question has come up about his evidence. Well, now, a defendant under our Constitution cannot be compelled to testify against himself. That is one of the most fundamental principles of our system of criminal law, and if he chooses to sit still nobody can criticize him for doing it. That is his right, either to sit still or to come for-

ward and take the stand. But, gentlemen, he can't come forward, so to speak, and take the stand piecemeal. If he waives his constitutional privilege, if he steps outside of the circle which the Constitution draws around him, and comes onto the stand here, he then becomes like a party in a civil case, and his failure to testify upon material points is to be considered by you exactly as you would consider the failure of a party in a civil case to give evidence that apparently lay within his knowledge upon material issues. The failure of a party to give, or to produce evidence within his knowledge or control, and material to the issue, is always proper to be considered by a jury. A jury may infer from the silence upon the matter that the party considered that the evidence would not help him; but that is not a *necessary* inference. It frequently happens that lawyers inadvertently forget to ask questions, material questions; and that ought not to count against the party, or the client, of course, if there is an unintentional omission; but an intentional failure on the part of a party to adduce evidence within his knowledge upon the points in issue, by whatever reason it is prompted, is always a very pertinent matter to be considered by a jury."

To this portion of the charge the defendants likewise excepted.

It is thus seen that upon objection being made to the argument of the District Attorney, at a time when he could have corrected the error, if one had been committed, the court ruled that the argument was proper; "that, the defendant Cunningham having taken the stand and testified as to certain facts in one of the indictments, his failure to testify as to independent facts in that indictment, and as to facts in the other indictment, was the subject of legitimate comment to the jury in argument;" and that later on in his charge to the jury he confirmed his previous ruling, when he stated that it was the right of the accused "either to sit still or come forward and take the stand," but if he did come forward he could not do so "and take the stand piecemeal"; that he waived his constitutional privilege if he stepped outside of the circle which the Constitution drew around him by coming upon the stand, the same as a party would in a civil case.

It cannot reasonably be said that the objection and exception to the argument and the ruling thereon were not seasonably and properly taken, or that the exception to the charge was not sufficiently specific to appraise the court of the ground of the objection. The record discloses that the court fully understood what the nature of the objection was upon which the defendants relied. This appears from what took place at the close of the argument of the District Attorney when this matter was without doubt fully discussed, and the definite and explicit ruling of the court was made. The question is therefore presented whether a defendant, when set to the bar for trial before a jury upon two indictments charging different offenses, by taking the stand and limiting his testimony to a particular charge in one of the indictments, waives his constitutional right with reference to the charge contained in the other indictment, so that inferences may be drawn against him from his failure to testify as to any of the matters there charged. It seems to us that to state the question is to answer it; that it was not the intention of Congress, in the enactment of the law authorizing the trial of an accused person for distinct offenses, at the same time, on two or more indictments, to deprive him of his constitutional right not to have inferences drawn against him by reason of his failure to testify upon one indictment, should he see fit to testify to matters charged

in the other indictment; and that this is especially true where the indictments are not consolidated by an order of the court, as they were not in this case, but were tried as independent and distinct matters, though before the same jury. Betts v. United States, 132 Fed. 228, 229, 230, 234, 235, 65 C. C. A. 452.

The exception taken to the ruling of the court made in answer to the objection of counsel to the argument of the District Attorney also presents the question whether, the defendant Cunningham having taken the stand and testified to certain facts in the first indictment, his failure to testify as to independent facts in that indictment was the subject of legitimate comment by the District Attorney in his argument.

This question has never been definitely decided by the Supreme Court. The cases in that court in which the question has been argued have involved the subsidiary question of the right of cross-examination under the federal rule, and have been disposed of either upon the ground that the limit to the right of cross-examination was not exceeded (Fitzpatrick v. United States, 178 U. S. 304, 20 Sup. Ct. 944, 44 L. Ed. 1078), or, if exceeded, the answers given were not prejudicial to the respondent (Sawyer v. United States, 202 U. S. 150, 26 Sup. Ct. 575, 50 L. Ed. 972, 6 Ann. Cas. 269). In Balliet v. United States, 129 Fed. 689, 695, 64 C. C. A. 201, decided in the Eighth Circuit, the defendant excepted to the following statement of the trial judge in his charge to the jury:

"It has been suggested that I have overlooked one thing. I may say you may consider, in determining the question, the fact that the defendant having gone upon the witness stand, if he has not fully explained, or has not explained matters which are material to the issues in this case, and which are naturally within his knowledge, you may consider that as a circumstance tending to show that the facts, if explained, etc., would bear out the contention of the government, and his failure to explain them or give a truthful explanation is against him."

And the court, in commenting upon the charge, said:

"We have not been able to conclude that this instruction states a correct rule of law, or that the giving of it was not a material error."

This instruction, which was held to be erroneous, did not differ materially from the one given in the case under consideration. The court, after discussing the matter at some length, without reaching any definite conclusion, then assumed that, if the defendant, upon taking the stand, waived his right not to have inferences drawn against him for failure to testify as to material matters, nevertheless the instruction in question gave too great latitude to the jury, and subjected the defendant to too great a burden in that "it left the jury to determine what matters which had been given in evidence were 'material to the issues in the case,'" without directions on that point, and gave "equal liberty to determine what matters were 'naturally within his knowledge' and susceptible of explanation."

Judge Sanborn concurred in the result reached in that case, but, it would seem, upon vitally different grounds. He took the position that the right of cross-examination in the federal court was limited strictly

to subjects inquired of in direct examination; that circumstances might arise under which the court, in the exercise of its discretion, might permit the examiner to inquire as to matters which had not been taken up in direct examination; but that this was not cross-examination, and, in doing so, the examiner made the witness his own. He fails, however, to state the conclusion which he intended should be drawn from this view of the matter. But it is evident that he entertained the opinion that, as applied to the case then under consideration, the defendant, by taking the stand, did not waive his constitutional right to be free from unfavorable comment, except as to matters to which his direct testimony particularly related, and that as to other matters he did not waive his privilege, and did not subject himself to unfavorable comment in this respect, if he declined or failed to testify as to them. And this is the view entertained by Judge Cooley. Cooley's Constitutional Limitations (3d Ed.) p. 317, note. In some jurisdictions, where the right of cross-examination is unlimited, it is held that a defendant, by taking the stand in a criminal case, waives his right not to have unfavorable inferences drawn against him, if he fails to testify to any material matter. State v. Ober, 52 N. H. 459, 13 Am. Rep. 88; Commonwealth v. Smith, 163 Mass. 411, 431, 40 N. E. 189; People v. Tice, 131 N. Y. 651, 655, 30 N. E. 494, 15 L. R. A. 669; Commonwealth v. Morgan, 107 Mass. 199, 205; Commonwealth v. Nichols, 114 Mass. 285, 19 Am. Rep. 346; State v. Wentworth, 65 Me. 234, 20 Am. Rep. 688; State v. Witham, 72 Me. 531. And in jurisdictions where the right of cross-examination is restricted to matters inquired of in chief, that he does not. People v. McGungill, 41 Cal. 429; People v. Sanders, 114 Cal. 216, 238, 46 Pac. 153; State v. Elmer, 115 Mo. 401, 22 S. W. 369; State v. Lurch, 12 Or. 99, 6 Pac. 408. It would seem that the courts, in reaching these conclusions, have been largely influenced by the rule existing in the different jurisdictions as to cross-examination—that if the right were unlimited the accused, by taking the stand under such circumstances, would waive his privilege—but, if it were limited to subjects inquired of on direct examination, his privilege would be waived only to that extent, as he had no reason to understand that his conduct would impose a greater burden. We understand the rule in the federal courts as to cross-examination to be as stated by Judge Sanborn in the Balliet Case, and are of the opinion that the defendant Cunningham, by taking the stand and testifying as to the commissions paid to agents, did not waive his constitutional right to be free from unfavorable comment on matters to which his testimony did not relate, and as to which he said nothing.

[6] Subject to the defendants' exception, the government was allowed to introduce in evidence a paper purporting to be a copy of a letter written at Chicago, on November 14, 1910, to "J. M. C.," and signed "H. B. C.," the contents of which disclosed that it was written in answer to a letter sent by J. M. Cunningham to H. B. Clark, which had been previously introduced in evidence. It appeared that H. B. Clark, at or about the time this letter was written, was the manager of the Orange Judd Company's Chicago office. The paper was identified as having been found in the files of the Orange Judd Company's

office in Chicago. It was not found in the possession of either Myrick or Cunningham, and there was no evidence that the original letter was ever addressed or mailed to Cunningham, or that it ever came into his possession. The defendants were not called upon to produce the original if they had it, and no legal basis was laid for the introduction of the copy. The evidence was of vital importance in support of the government's contention, for the contents of the paper disclosed that, if the original letter was received by Cunningham, he knew that a large number of the subscriptions to the Minnesota and Dakota Farmer, which he had included in his answers (a) to (g), in the first application, were three months or more overdue. Under the circumstances, the court erred in allowing the paper to be introduced in evidence.

We have examined the other exceptions taken by the defendants, and are of the opinion that they raise no question calling for special consideration.

The judgments ordered against the plaintiff in error Myrick, in Nos. 1034 and 1036, are reversed, the verdicts therein are set aside, and the cases are remanded to the District Court for further proceedings not inconsistent with this opinion.

The judgments ordered against the plaintiff in error, Cunningham, in Nos. 1035 and 1037, are reversed, the verdicts therein are set aside, and the cases are remanded to the District Court for further proceedings not inconsistent with this opinion.

PUTNAM, Circuit Judge (dissenting). On its face, the most difficult proposition in behalf of the respondents, raised by the opinion of the court, is that based on the admission of what is apparently a copy of a letter, signed H. B. C., addressed to J. M. C., dated November 14, 1910. This was put in by the United States under objections which were sufficiently specific and yet sufficiently general to cover every possible objection. No objection raised by the respondents seems to have been waived. It is admitted by the respondents that this paper was identified as having been found in the files of the Orange Judd Company's office in Chicago; but it is said that:

"It was not found in the possession of either Myrick or Cunningham, and that there was no evidence that the original letter was ever addressed or mailed to Cunningham, or that it ever came into his possession."

If improperly admitted, it was fatal in its character, and the exception taken would demand a new trial for Cunningham, if not for Myrick. Moreover, as the indictments here rest on conspiracy between Cunningham and Myrick, with no other conspirator, a new trial of either would require a new trial of both respondents, because without both no conspiracy could be established.

The expressions that these papers were not found in the possession of either Myrick or Cunningham, and that there was no evidence that the original letter was ever addressed or mailed to Cunningham, or that it ever came into his possession, must be qualified, although perhaps in one sense true.

First of all, it is not questioned that J. M. C. meant Cunningham,

and that H. B. C. meant Clark. It is, however, no matter whether H. B. C. meant Clark, for the true question is what information the paper brought to Cunningham or Myrick; and, so far as that is concerned, it is of no importance whom it came from. That would not affect the admissibility, but only the weight. H. B. Clark was the agent at the time in charge of the Chicago office, where this letter or copy was found. It was objected to because it "was not properly proved, was not an original, and because there was no notice to produce the original given until the moment of the offer" of the paper in proof, "and because the original was not present in court or then procurable." The court avoided all these objections, and it is not clear on what ground the paper was admitted. Therefore we have to determine whether any of the objections stated were effectual.

The substance of the matter is that the paper was not put into the case as a letter, but as a paper obtained from the possession or imputed possession of the respondents, which brought to their notice certain facts essential to the prosecution by the United States. Whether the paper was an original or a copy affected its weight, and not its relevancy. If proved as an original, the jury might have thought it to have been an authentic statement of the facts it contained, supported by the full weight which the personality of the author could have given to it. If a copy, it might have been of more or less weight, according to the belief of the jury on the question whether either of the respondents personally saw it, and on the further question whether they credited it.

One witness, Fred E. Clark, employed by the respondents, identified the paper as having been found in the files of the Orange Judd Company's Chicago office. While there was no direct proof as to who the writer was, or whether it had ever been delivered to anybody, there was the fact that this particular paper had been retained on the files at Chicago, as said, which was sufficient to justify a jury in giving it a certain authenticity; and determining whether or not either of the respondents had any connection with it would be a matter for the jury, in view of other facts to which we will call attention. It must be remembered, however, that Cunningham's office was in Springfield, Mass.; and there is no proof that this particular paper had ever been in Springfield.

Several representatives of the United States, known as post office inspectors, seem to have made a somewhat protracted investigation of the transactions involved in this litigation, which covered a considerable space and time subsequent to the date of the paper signed H. B. C., of November 14, 1910, herein involved. In connection with that investigation, Cunningham, in February, 1911, at Springfield, Mass., met Stice, one of the inspectors engaged therein, and also met Myrick at Springfield for the first time on March 3, 1911. Stice had protracted conversations with both Cunningham and Myrick in February and March; and in one of the conversations Stice told Cunningham that the inspectors were assisting the postmaster, probably meaning the postmaster general, in the examination of the evidence relating to the applications now involved, and "asked him for the evidence."

Thereupon Cunningham said that he would furnish it; "that everything was wide open to the department"; and that he would furnish all the evidence pertaining to the matter. It appeared also that the files and lists of the Orange Judd Company "had been unreservedly open for inspection," and that this "would seem to furnish all the information bearing upon this case." Marles, another inspector, testified that he had to do with the investigation, and that he met Cunningham on February 6, 1911, "and Cunningham stated that everything they had was wide open to the inspectors."

The paper in question here was found, as we have said, in the files of the Orange Judd Company's Chicago office, and apparently was admitted by the court on the ground that it appeared to be a part of a batch of papers of which another letter, not objected to, had been admitted. It is to be observed, however, that the examination of these files, and the production of the papers which they contained, were not mere cursory matters, or merely incidental, but were in consequence of these offers by Myrick and Cunningham of the files of the Orange Judd Company, at Chicago at least, for the purpose of exhibiting to the officers of the United States exactly what Myrick and Cunningham, or one or both of them, had done in this connection, or for the purpose of enabling the United States to understand the detailed facts in reference thereto. Consequently, the paper in question was thus indirectly produced by one or both of the respondents voluntarily. Though this was not in court, yet the paper was produced in such way that it became a part of the respondents' case, or the case of the United States, by the express consent of the respondents, for the purpose, especially, of showing on what information the respondents had acted in securing a second-class rate for their publication. Therefore, the whole transaction was entirely outside of the question of production of the originals. The question was not the contents of the originals, but was what information the respondents Cunningham and Myrick, one or both of them, had acquired from the papers on file to which the officers of the United States had been given access. This has no connection whatever with the matter of giving notice to produce the originals.

The respondents had given their consent to the use of the papers in these files by the United States, but it may be objected that Myrick and Cunningham had not thereby given consent to the use of this particular paper, because it may be objected that they did not know that this particular paper was on the files; but their consent was a universal one, and no discrimination of that kind can properly be made, and no discrimination was relied on. Under the circumstances of the case, which were very complex and numerous, it could not have been necessary to prove facts of that kind with reference to any special paper when a universal consent had been given as to all of them.

Moreover, under the circumstances, the jury had a right to infer, and there was evidence enough to enable them to find properly, that Cunningham was familiar with everything that was on file relating to this topic. If he had not been, it was proved that Myrick had that familiarity, as pointed out in the brief of the United States, where it is

shown that in a letter written by Myrick, signed by his initials, on January 5, 1911, he referred to a copy of a letter of November 10th from Cunningham, to which copy the paper in question had been physically attached; the United States thus showing that Myrick knew of the second paper, which was the letter from Cunningham of November 14, 1910. Myrick's knowledge of the letter of November 10, 1910, presumptively carried with it the belief that he knew of this identical paper of November 14, 1910. As Myrick is one of the conspirators, and the question was as to the extent of the knowledge of either conspirator of the facts subsequently brought by the conspirators to the post office authorities, the paper in question became evidence, whether it affected either or both conspirators.

The other important question is the notice taken by the opinion of the court of the observations of the District Attorney as to the testimony of Cunningham. The respondents failed to avail themselves of the summary way of objecting to improper observations by counsel in the manner pointed out by this court in Odell Mfg. Co. v. Tibbetts, 212 Fed. 652, 655, 129 C. C. A. 188. On the other hand, they submitted formal requests for instructions by the court in its charge as to the extent of cross-examination permissible with reference to an accused person who testifies voluntarily. That precise request was not followed literally; but a more suitable ruling was given by the court which avoided certain errors in the request, and which was indeed more liberal for the respondents than the request as properly interpreted. At any rate, the charge as given was clearly so correct for the most part that, if there was any error in it, a general exception would not lie; but it was the duty of counsel to bring the specific matter to the attention of the court.

The respondents particularly urge that the witness was testifying only as to one indictment, while the jury was allowed on this point to apply the inference on which the United States relied to the two indictments. There is a strange error here. It is true that the indictments in these cases were not consolidated in the proper sense, as permitted by Revised Statutes of the United States, § 1024 (Comp. St. 1913, § 1690); but they were in the condition of being tried together, the same as the indictments in Betts v. United States, before this court in August, 1904, reported in 132 Fed. 228, 65 C. C. A. 452. Nevertheless, when the respondent was sworn as a witness, he was sworn to both indictments, and he was testifying as to both indictments. There was only one oath, and he was testifying as though in a single case.

In discussions of this kind, merely verbal or literal slips are not to receive attention, except as they are signs of underlying error; as, for example, where it is erroneously said that the court had ruled that the argument of the District Attorney in this case "was proper." There was likewise a more serious discrepancy in omitting from respondents' statement of what occurred between court and counsel the words then used by the court in closing what was said, namely, "decline to deal with the matter in the charge save as hereinafter set forth." It was also erroneous to assume that the exceptions of the respondents were to the "charge," when, indeed, they were laid to what was said by the

court before the charge was given, without express reference to the charge as it was in fact given.

We do not here question the complicated condition of the issues as put forward by the respondents. We have only sought to discuss those statements which call for a reversal, which we are of the opinion cannot justly be demanded. We do not mean to be prejudiced by any omission to refer to matters not herein discussed. It is enough for us to say further that we regard the conviction as a legal one, and one that ought to be sustained.