## Commonwealth v. Kehoe-Berge Coal Company

*Peter Kanjorski*, city solicitor, for Commonwealth.
*Joseph Gallagher* and *James T. Shea*, for defendant.

PINOLA, J., June 21, 1950.—We have for consideration the appeal of the Kehoe-Berge Coal Company from the imposition of the fine of $1 and costs, amounting to $3.80, upon defendant for having parked a Buick station wagon bearing license J2152 in a parking meter zone on South Prospect Street, in the City of Nanticoke, on January 11, 1950, without having placed a coin in the meter controlling the zone.

Section 9 of the ordinance regulating parking meters reads as follows:

"It shall be unlawful . . . for any person to operate or cause, allow, permit, or suffer any vehicle registered in the name of, or operated by such person to be parked overtime, beyond the period of legal parking time established for any parking meter zone in the City of Nanticoke, Pa."

Section 2 (C) declares:

"The word 'person' shall mean and include every natural person, firm, co-partnership, association or corporation."

The six reasons assigned in the petition for the appeal give rise to three questions:

1. Was the ordinance advertised in compliance with the law?

2. Did the city clerk, within one month after the passage of the ordinance, record and certify the ordinance in the ordinance book?

3. Does the denial by the city clerk of defendant's right of inspection of the ordinance book affect the validity of the ordinance?

From all the testimony we make the following

### Findings of Fact

1. The parking meter ordinance was passed by the City Council of Nanticoke on February 7, 1949, and it was transcribed in the ordinance book and there certified by the mayor and city clerk within 10 days from its passage.

2. The ordinance was advertised in the Times Leader-Evening News, printed in the City of Wilkes-Barre, on February 11, 14 and 16, 1949, and in the Sunday Independent, printed in the City of Wilkes-Barre, on February 13, 20 and 27, 1949.

3. The Times Leader-Evening News had, in February 1949, a general circulation in Northeastern Pennsylvania of 59,000, of which 4,900 copies were distributed in the City of Nanticoke.

4. The Sunday Independent had, in February 1949, a circulation in Luzerne County of 38,000, of which 3,150 copies were distributed in the City of Nanticoke.

5. The Nanticoke Daily Press is printed and published in Nanticoke daily from Monday to Friday, inclusive.

6. The Nanticoke Daily Press is not entered as second class matter under the postal rules and regulations.

7. The Nanticoke Daily Press does not have a legitimate list of subscribers.

8. Defendant parked its station wagon in a space on South Prospect Street controlled by a meter without inserting a coin in the meter as required by the ordinance.

## Discussion

The question of the legality of the advertisement of the ordinance would not arise now, because under the Act of May 2, 1949, P. L. 874, an ordinance may be advertised in any newspaper printed *or* circulated in the City of Nanticoke. In February 1949 the law was different.

Section 1015 of the Third Class City Code of June 23, 1931, P. L. 932, as amended, 53 PS §12198-1015, then provided, inter alia:

"Every ordinance prescribing a penalty for the violation thereof shall be forthwith published . . . in at least one and not more than two newspapers *printed and circulated* within the city, in the manner provided by section one hundred and nine of this act."

Section 109 provides (53 PS §12198-109) :

"Whenever, under the provisions of this act, advertisement, notice, or publication is required to be published in one newspaper, such publication shall be made in a newspaper of general circulation, as defined by the Newspaper Advertising Act of May sixteen, one thousand nine hundred and twenty-nine (Pamphlet Laws, one thousand seven hundred eighty-four), printed in the city, if there is such a newspaper, and, if not, then in a newspaper circulating generally in such city."

The Newspaper Advertising Act of May 16, 1929, P. L. 1784, 45 PS §3, provides:

"(1) 'Newspaper' means a printed paper or publication, bearing a title or name, and conveying reading or pictorial intelligence of passing events, local or general happenings, printing regularly or irregularly editorial comment, announcements, miscellaneous reading matter, commercial advertising, classified advertising, legal advertising, and other notices, and which has been issued in numbers of four or more pages at short intervals, either daily, twice or oftener each week, or weekly, continuously during a period of at least six months, or as the successor of such a printed paper or publication issued during an immediate prior period of at least six months and which has been circulated and distributed from an established place of business to subscribers or readers without regard to number, for a definite price or consideration, *either entered or entitled to be entered* under the Postal Rules and Regulations *as second class matter in the United States mails, and subscribed for by readers at a fixed price* for each copy, or at a price fixed per annum: Provided, A newspaper may be either a daily newspaper, weekly newspaper, newspaper of general circulation, official newspaper, or a legal newspaper, as defined by this act.

"(4) 'Newspaper of General Circulation' means a newspaper issued daily, or not less than once a week, intended for general distribution and circulation, and sold at fixed prices per copy per week, per month, or per annum, to subscribers and readers without regard to business, trade, profession or class."

Both the Times Leader-Evening News and the Sunday Independent are entered under the postal rules and regulations as second class matter in the United States mails.

The Nanticoke Daily Press is not so entered and sends about 75 copies of its paper through the mails as third class matter.

Therefore, the city council was not, under the law existing at the time, required to advertise the ordinance in the Nanticoke Daily Press, unless it was "entitled to be entered under the Postal Rules and Regulations as second class matter in the United States mails."

Section 14 of the Act of March 3, 1879, c. 180, 20 Stat. at L. 359, 39 USC §226, lists the requirements for admission of publications to second class mail privileges. They are as follows:

"First. It must regularly be issued at stated intervals, as frequently as four times a year, and bear a date of issue, and be numbered consecutively. Second. It must be issued from a known office of publication. Third. It must be formed of printed paper sheets, without board, cloth, leather, or other substantial binding, such as distinguish printed books for preservation from periodical publications. Fourth. It must be originated and published for the dissemination of information of a public character, or devoted to literature, the sciences, arts, or some special industry, and having a legitimate list of subscribers. Nothing herein contained shall be so construed as to admit to the second class rate regular publications designed primarily for advertising purposes, or for free circulation, or for circulation at nominal rates."

From the testimony of B. F. Howells, publisher of the Nanticoke Daily Press, we are satisfied that the Nanticoke Daily Press is not entitled to the second class privileges because it does not possess "a legitimate list of subscribers".

He testified that he distributes about 2,700 copies of his paper daily using 13 boys in the City of Nanticoke, who pay him 10 cents per month for each subscription. They in turn collect 40 cents per month from the subscriber.

When asked, "Do you have subscription records?" he answered, "Not complete subscription records".

Again he was asked:

"Q. Do you have office records of those subscribers?

"A. I don't have complete office records, I depend on the route boys for records.

"Q. You don't have a record of the subscribers?

"A. I don't have a record of the subscribers, some I do.

"Q. But complete records, no?

"A. They would probably be not complete records."

Later he testified as follows:

"Q. The only record as to subscribers is the fact that you give newspapers to 13 boys?

"A. That's right."

On further cross-examination, he testified as follows:

"Q. Previously you said 2,800; do you keep book accounts for money collected from subscribers?

"A. My books are very poor, I don't keep books, we may have books but not complete books.

"Q. Your books do not tell the number of subscribers?

"A. Not exactly.

"Q. You keep no subscriber lists?

"A. Some subscribers; we depend on the boys' route books, mostly dime store note books.

"Q. Couldn't tell the number of subscribers?

"A. I could not."

By Mr. Gallagher:

"Q. Mr. Howell, did you say that the school boys who sell your paper keep lists of subscribers?

"A. They do.

"Q. Do you check those lists?

"A. They keep them in dime store books, route books, showing how much they collected, 10-cent store note books.

"Q. Showing the name and address the paper was delivered to?

"A. Yes."

By Mr. Griffith:

"Q. Are you able to produce those in court?

"A. This is all I brought up today (indicating newspapers).

"Q. The only books you have are the boys' books, your own books; can you show us how much of a subscription list you have, what subscribers you have and where your papers went month by month?

"A. That would be very difficult.

"Q. Can you do it?

"A. I would rather say 'No' than attempt to do it."

The phrase "a legitimate list of subscribers" means a list of subscriptions taken at more than a nominal price. Furthermore, the subscriptions must be paid up in order to be legitimate. This publisher has no list whatever of the subscribers and no record of the payment by the subscribers. It may well be that although he has set the price at 40 cents per month and sells the paper to the boys at 10 cents per month, that the papers are sold for varying prices, for whatever the boys can get. Such procedure would not answer the requirements of the statute in this particular: Myrick v. United States, 219 Fed. 1.

In our opinion the city council complied with the law in advertising the ordinance as it did.

The second question, Did the city clerk, within one month after the passage of the ordinance, record and certify the ordinance in the ordinance book? must be answered in the affirmative.

Section 1015 of the Third Class City Code of June 23, 1931, P. L. 932, as amended, 53 PS §12198-1015, provides, inter alia:

"All ordinances shall, within one month after their passage, be certified and recorded by the city clerk, in a book provided by the city for that purpose, which shall be at all times open to the inspection of citizens."

This provision requires that the city clerk shall transcribe the ordinance in the ordinance book and certify that it was duly passed on a certain date.

"Official acts or duties are, in the absence of evidence to the contrary, presumed to have been properly performed; and, as a general rule, it is presumed that a public official discharges his duty or performs an act required by law in accordance with the law and the authority conferred upon him, and that he acts fairly, impartially, and in good faith:" 31 C. J. S. 798, 799.

In Falkinburg v. Venango Township, 297 Pa. 358, 362, the court declared:

"Supervisors as public officers are presumed to have properly performed their duties and to have taken the steps necessary to give validity to their official acts. (Citing cases) This is a rebuttal presumption and may be overcome by proof."

In the case before us the presumption is borne out by the proof. The ordinance was transcribed in full in the ordinance book. However, instead of being certified by the city clerk alone, it is officially certified by both the mayor and the city clerk in these words: "Passed and adopted finally at the meeting of the City Council held on the 7th day of February, 1949."

The signature of the city clerk alone is sufficient compliance with the law. The fact that the mayor himself signed it neither adds nor detracts from his compliance with the law. However, in our opinion, it is a wholesome practice and it has our approval. There can be no question about the passage of an ordinance when both the mayor and the city clerk do certify to such passage in the original ordinance book.

The city clerk, Joseph Radaduski, testified positively that he transcribed the ordinance in the ordinance book within 10 days from the date of its passage and that he

and the mayor certified it in the ordinance book within that time. Appellant, on whom the burden rested, has not shown the facts to be different.

The third question, Does the denial by the city clerk of defendant's right of inspection of the ordinance book affect the validity of the ordinance?, must be answered in the negative.

We have no reason to doubt Mr. Shea when he says that the city clerk failed or refused to produce the ordinance book when requested, during the summer of 1949, but we cannot see how any failure on the part of the clerk to perform his duties can affect the validity of the ordinance in question. While Mr. Shea declares the clerk told him there was no ordinance book, the clerk himself denied that he ever made any such statement. The book was produced at trial and the ordinance is transcribed therein.

From the findings of fact we reach the following

## Conclusions of Law

1. The Nanticoke Daily Press is not entitled to be entered under the postal rules and regulations as second class matter in the United States mails.

2. The parking ordinance of the City of Nanticoke was transcribed in the ordinance book and certified as required by law.

3. The parking ordinance of the City of Nanticoke was properly advertised in compliance with the law.

4. The parking ordinance is valid.

Therefore, we enter the following

## Judgment

Now, June 21, 1950, the Kehoe-Berge Coal Company is adjudged guilty and it is directed to pay a fine of $1 and all costs.